UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARRIE LYNN THOMASON,

      Plaintiff                            Civil Action No. 16-10288

v.                                  HON. LINDA V. PARKER
                                      U.S. District Judge
                                      HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL            U.S. Magistrate Judge
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Carrie Lynn Thomason ("Plaintiff") brings this action under 42 U.S.C. § 405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED [Docket #26] and that Plaintiff's Motion for Summary Judgment [Docket #20] be DENIED.

## PROCEDURAL HISTORY

On August 25, 2012, Plaintiff filed an application for DIB, alleging a disability onset date of April 10, 2011 (Tr. 143-144). After the initial denial of the claim, Plaintiff filed a request for an administrative hearing, held on February 20, 2014 in Livonia, Michigan before Administrative Law Judge ("ALJ") Donald G. D'Amato (Tr. 56). Plaintiff, represented by

-1-

Richard Jenks, testified, as did Vocational Expert ("VE") Ms. Holder (Tr. 59-70, 71-75). On April 25, 2014, ALJ D'Amato found that Plaintiff was not disabled (Tr. 39-51). On August 28, 2015, the Appeals Council denied review (Tr. 7-12). Plaintiff filed for judicial review in this Court on January 27, 2016.

## BACKGROUND FACTS

Plaintiff, born September 13, 1971, was 42 when the ALJ issued his decision (Tr. 51, 143). She completed high school (Tr. 164) and worked previously as a manager of a group home (Tr. 165). She alleges disability as a result of depression, anxiety, diabetes, a heart condition, hypertension, sleep apnea, hyperlipidemia, foot and ankle problems, and swelling of the legs, hands, and face (Tr. 163).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony:

She lived in Wayne, Michigan (Tr. 59). She became disabled on April 10, 2011 after breaking her left ankle and fibula (Tr. 60). Since then, she had developed adhesive capsulitis of the right shoulder (Tr. 60). She also experienced tachycardia, diabetes, pulmonary hypertension, sleep apnea, severe respiratory allergies, arthritis of the left knee and back, and a history of chest pains and kidney stones (Tr. 61-62). She stood 5' 8" and weighed 380 pounds (Tr. 61).

Due to back and knee problems, Plaintiff was unable to walk for more than short distances (Tr. 63). On a scale of 1 to 10, she rated her pain without medication as a "6 or 7," and with, 3 (Tr. 63). She also experienced bilateral leg numbness and restless leg syndrome (Tr. 63-64). She took Norco and Vicodin for pain (Tr. 63). She could sit for a maximum of 15 minutes, stand for 10 minutes, and walk less than one city block (Tr. 64). She could lift up to 10 pounds on a frequent basis (Tr. 65). Her home had been outfitted with ramps and

handicap-friendly bathroom hardware (Tr. 65).

Plaintiff experienced concentrational problems resulting from depression and anxiety (Tr. 65). She experienced obsessive thoughts and isolated herself from others (Tr. 65-66). Two months earlier, as a result of her psychological condition, she had asked her former boyfriend to assume care of their daughter (Tr. 66). The former boyfriend, now living with her, assumed responsibility of cleaning, preparing meals, and taking care of her cats (Tr. 66). She drove on a rare basis due to her dislike of being out in public (Tr. 66).

In response to questioning by her attorney, Plaintiff reported that she also experienced hand numbness around three times a week (Tr. 67). She alleged limitations in reaching to around 19 inches (Tr. 68). She testified that she spent 20 of 24 hours each day in her room (Tr. 68). She spent her time sleeping, looking at the computer, and eating (Tr. 68). Her pain medication made her "tired and woozy" (Tr. 69). She also experienced sleep disturbances, waking up three to four times each night (Tr. 69). She had seen her psychiatrist the previous week but had not taken psychotropic medication for the past month due to financial constraints (Tr. 70).

## B.   Medical Evidence[1]

### 1.   Treating Sources

January, 2011 imaging studies of the left knee showed moderate arthrosis and marked thinning of the cartilage (Tr. 604). In April, 2011, Plaintiff sought treatment for a left fibula and bimalleolar ankle fracture incurred while on an outing with a group home resident (Tr. 222, 234, 245, 336). She was admitted to the hospital for four days after surgery because obesity, and her history of diabetes exacerbated the injury (Tr. 222). She underwent surgery

---

[1]Conditions unrelated to the benefit claim, reviewed in full, have been omitted from the present discussion.

for repair of the ankle fracture (Tr. 254, 278-279).  She was prescribed Valium for anxiety (Tr. 286).  Shortly after discharge, she was readmitted after contracting "hospital acquired" pneumonia (Tr. 218).  Discharge records also note the conditions of anemia and anxiety (Tr. 219, 267).  Due to "mobility deficits," Plaintiff was discharged to a rehabilitation facility for "intensive" physical therapy (Tr. 254, 284).  May, 2011 imaging studies showed an enlarged heart with "early pulmonary edema" (Tr. 261).  Plaintiff reported that she lived with her daughter and a "significant other" (Tr. 264).  June, 2011 records state that she required the use of a cane to go from a sitting to standing position and required the use of a cane and handrail to climb stairs (Tr. 295-296).  She exhibited a mildly impaired right grip (Tr. 306).  She was deemed "motivated" to perform activities of daily living independently (Tr. 331).

June, 2011 therapy discharge records state that Plaintiff walked with an abnormal gait, experienced difficulty going from sitting to standing, and exhibited endurance and range of motion deficits (Tr. 255, 314).  She was discharged to home "with care giver" after her house was outfitted with ramps and handicap-friendly bathroom equipment (Tr. 310).  The same month, orthopaedic specialist Rahul Vaisya, M.D. noted Plaintiff's complaint of continuing ankle pain and numbness (Tr. 383).  However, Plaintiff reported that she was able to walk to Starbucks with use of a cane (Tr. 383).  In August, 2011, Anil Seth, M.D. noted Plaintiff's report of only partial relief from pain medication (Tr. 376).  Plaintiff reported that she could stand for up to 45 minutes (Tr. 376).  Dr. Rayos' September, 2011 treating records state that Plaintiff had applied for Workers' Compensation benefits and was taking Vicodin for pain control (Tr. 351).  Dr. Vaisya observed that the surgically installed hardware appeared stable (Tr. 381, 384).  Dr. Brian Whalen, P.T. found that Plaintiff's ability to participate in physical therapy was limited by hypertension and edema (Tr. 434, 439-441).  He found a "functional range of motion and strength," opining that she was "an ideal candidate to transfer to return

-4-

to work services," but noted that she experienced "paresthesia and edema" unrelated to the ankle fracture (Tr. 432).

Treating records by Lynda Rayos, D.O. from the following month state that Plaintiff experienced elevated blood pressure (Tr. 354). Antoine Geffrard, M.D. prescribed Norco for "severe pain" and physical therapy (Tr. 485). Dr. Vaidya noted Plaintiff's report of improvement with some degree of knee pain and numbness due to diabetic neuropathy (Tr. 378). Dr. Geffrard's October, 2011 records state that Plaintiff's "anxiety over her limitations . . . seem[s] to overshoot her actual limitations. . ." (Tr. 408). The same month and in November and December, 2011, Dr. Geffard wrote a prescription for a "work hardening program" (Tr. 482-484). In December, 2011, Dr. Lindsey Ireland, P.T. found that due to the upcoming removal of hardware, Plaintiff would "likely not return to work until after recovery from the surgery," finding that work hardening was "no longer appropriate . . ." (Tr. 424, 426). The same month, Plaintiff reported that her diabetes had become "less controlled" in the past year (Tr. 371).

In March, 2012, Dr. Rayos referred Plaintiff to a diabetic specialist (Tr. 346). In April, 2012, Dr. Vaisya performed surgery for the removal of hardware implanted at the time of the April, 2011 ankle surgery (Tr. 441, 488-489). In May, 2012, Dr. Vaidya recommended more physical therapy, noting that Plaintiff needed "to be retrained to do a sit-down job . . . sometime in early July" (Tr. 367). On May 31, 2012, Dr. Geffrard found that Plaintiff was unable to work due to gait disturbance (Tr. 481). The following month, he recommended vocational rehabilitation (Tr. 479). Dr. Geffrard's July, 2012 records state that Plaintiff reported level "2-4" pain (Tr. 391). He found that Plaintiff had an antalgic gait due to both the ankle injury and morbid obesity (Tr. 391).

In September, 2012, Dr. Rayos noted a reduced range of right shoulder motion and

neuropathy of the lower extremities (Tr. 526-527).   An MRI of the right shoulder was positive for adhesive capsulitis (Tr. 602).

In February, 2013, psychological intake records state that Plaintiff had experienced increased depression since the April, 2011 injury (Tr. 617).  Plaintiff reported that she was hospitalized for panic attacks in 2007 (Tr. 617).  She expressed a desire to acquire training for a "sit-down" job (Tr. 618).  She appeared fully oriented but depressed (Tr. 618).  She reported daily activities of taking care of personal needs, cooking, and taking care of her daughter (Tr. 620).  She denied suicidal ideation (Tr. 620).  She was assigned a GAF of 41 to 50 due to depression, anxiety, and physical and unemployment problems[2]  (Tr. 622).  An assessment from the following month noted unremarkable judgment and insight (Tr. 642).

Dr. Rayos' March, 2013 records state that Plaintiff was not taking insulin as directed due to insurance problems (Tr. 549).   She noted that Plaintiff was currently seeing a psychiatrist for depression, anxiety, and obsessive compulsive disorder ("OCD") (Tr. 549).  Dr. Rayos' notes from the following month state that Workers' Compensation decision-makers had determined that the ankle numbness was attributable to a condition unrelated to the ankle break (Tr. 553).  April, 2013 counseling records, noting that Plaintiff had attended only two out of four scheduled appointments, state that she "either does not need therapy" or was unwilling to devote the time required for therapy (Tr. 648).

In May, 2013, rehabilitation specialist David M. McElroy, M.D. found that Plaintiff was limited to a "sit down job" (Tr. 588).  Counseling records note "ongoing stressors" due to Plaintiff's dispute with Workers' Compensation and her daughter's problems (Tr. 630).

---

[2]

A GAF score of 41 to 50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job.  *Diagnostic and Statistical Manual of Mental Disorders--Text Revision,* 34 ("*DSM-IV-TR*")(4th ed.2000).

The records note "mild" concentrational deficiencies (Tr. 630). In June, 2013, Dr. Rayos noted that Plaintiff could not be considered for bariatric surgery until her sugar levels were controlled (Tr. 560). An echocardiogram was unremarkable (Tr. 657, 669). X-rays of the left ankle and lumbar spine, taken in response to Plaintiff's report of continued pain, showed degenerative changes to the ankle but were otherwise unremarkable (Tr. 576, 578, 586, 600, 606). Ophthalmological records from the same month were negative for diabetic retinopathy (Tr. 612). July, 2013 counseling records note a reduction in depression and anxiety (Tr. 628). August, 2013 records state that Plaintiff sustained a muscular injury while walking on some sand dunes (Tr. 584). Counseling records from the next month note "some degree of depression and insomnia" and that Plaintiff was concerned that her daughter was being bullied (Tr. 626). In December, 2013, Dr. McElroy found that Plaintiff was "actually doing pretty well" (Tr. 579). He observed that Plaintiff was "seated upright in no distress" (Tr. 579).

### 2. Non-Treating Sources

In November, 2011, Neil A. Friedman, M.D. examined Plaintiff on behalf of Accident Fund Insurance Company of America (Tr. 449-458). He observed that Plaintiff was able to walk short distances without the use of a cane and had "an essentially normal gait" (Tr. 455) Dr. Friedman found that "[w]eight loss would contribute greatly" to decreasing the left ankle problems (Tr. 458). He found that Plaintiff was capable of work limited by "no standing or walking continuously for more than 30 minutes," no lifting above 20 pounds, and "an unlimited sit/stand option" (Tr. 458).

In December, 2012, Terrance A. Mills, Ph.D. performed a consultative psychological evaluation on behalf of the SSA, noting Plaintiff's report that she had been cut off from Workers' Compensation benefits and was about to be evicted from her home (Tr. 515).

Plaintiff reported that she had become "isolative" since the April, 2011 accident (Tr. 516). Dr. Mills observed that Plaintiff walked slowly with a cane, limped, and stated that she no longer wanted to live (Tr. 516). Dr. Mills observed a constricted affect and depressed mood (Tr. 516). Plaintiff exhibited a normal mental capacity (Tr. 516). Dr. Mills assigned Plaintiff a GAF of 41 with a guarded prognosis (Tr. 517). He found that Plaintiff was "unable to do work activities" (Tr. 517).

The same day, Leonidas Rojas, M.D. performed a consultative physical examination on behalf of the SSA, noting that the treating and examining records showed a normal thought content (Tr. 521). He noted mild tenderness of the right shoulder and a "minimally guarded gait" but that she was able to ambulate with a cane (Tr. 521). He found normal manipulative abilities and only mild difficulty squatting (Tr. 521). He found full grip strength but that Plaintiff was unable to "heel and toe" walk (Tr. 523).

The same month, psychiatrist Ashok Kaul, M.D. performed a non-examining review of the medical records on behalf of the SSA, finding that Plaintiff experienced mild restriction in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 84).

In March, 2013, orthopedic surgeon Jerry Matlen, M.D. examined Plaintiff on behalf of Accident Fund Company (Tr. 535-548). Reviewing the treating and examining records, he found "no need" for additional ankle treatment (Tr. 547). Due to Plaintiff's allegations of right shoulder problems, he found that she "would benefit from avoiding repetitive overhead reaching," lifting no more than seven pounds, and "reaching of no more than 19 inches" (Tr. 548).

### 3.  Material Submitted After the April 25, 2014 Administrative Decision[3]

February, 2014 psychological records state that Plaintiff was not at risk for self-harm or harm to others (Tr. 672).  She opted to come to the agency rather than stay at home for the assessment (Tr. 686).  Plaintiff reported that she was not looking for work and had an upcoming disability hearing (Tr. 673).  She denied problems with activities of daily living (Tr. 674).  Plaintiff reported that she did not need to cook or clean but could if required (Tr. 675).  She reported that she was not interested in engaging in "meaningful activities" and did not like being around other people in public "too much" (Tr. 676).  Treating records note "mild" deficiencies in attention span and concentration (Tr. 688).  The following month, Plaintiff denied new psychiatric symptoms (Tr. 681).

---

[3]

Sentence six of 42 U.S.C. § 405(g) states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ..." As such, this Court may consider the newer evidence only for purpose of determining whether remand is appropriate under the sixth sentence of § 405(g).  The Appeals Council declined to find that the new material provided grounds for remand (Tr. 7-13).  My own review shows that even assuming that Plaintiff could provide "good cause" for the failure to submit the newer evidence prior to the administrative decision, she cannot show that the evidence is "material" to the ALJ's decision. *Sizemore v. Secretary of Health & Human Services*, 865 F.2d 709, 711 (6th Cir. 1988). To show that the newer evidence is material, the claimant "must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id.*

The February and March, 2014 records undermine rather support Plaintiff's claim for benefits. For example, Plaintiff's report that she was able to cook and perform household chores (but did not need to) flatly contradicts her testimony from the same month that her former boyfriend was forced to move in with her because she was unable to perform such tasks (Tr. 65-68).  The February, 2014 observations of "mild" concentrational limitations stands at odds with Plaintiff's allegations that deficiencies in concentration prevented her from working.  *Id.*  While Plaintiff also claimed that she was psychologically unable to be around others or go out in public on a regular basis, she opted to schedule a psychological evaluation at the agency rather than have personnel come to her home (Tr. 65-66).

### C.       Vocational Expert Testimony

VE Holder classified Plaintiff's previous work as a group home manager as skilled and exertionally medium[4] (exertionally heavy as performed) (Tr. 72).  The ALJ then posed the following question, taking into account Plaintiff's age, educational level, and work experience:

> [A]ssume an individual . . . who has the following limitations.  Requires work that is unskilled, with one, two, or three step instructions.  Occasionally in close proximity to co-workers and supervisors, meaning that the individual could not function as a member of a discrete team and contact with co-workers and supervisors is largely superficial.  No direct interactive contact with the public.  In a low stress environment defined as having only occasional changes in the work setting.  Such individual can lift or carry five pounds frequently and 10 pounds occasionally.  Requires a sit/stand option while remaining at the workstation.  Option means that the individual can sit or stand at will while performing their assigned duties.  Can stand and/or walk with normal breaks for a total of two hours in an eight-hour workday.  Occasionally needs a cane to ambulate.  Can sit with normal breaks for a total of six hours in an eight-hour workday.  Can perform pushing and pulling motions with the upper and right lower extremities within the aforementioned weight restrictions for not more than two-third[s] of an eight-hour workday.  Needs to avoid hazards in the workplace such as moving machinery and unprotected heights.  Needs to be restricted to a relatively clean work environment, meaning stable temperatures, stable humidity, and good ventilation that allows the individual to avoid concentrated exposure to dust, fumes, gases, odors, and other pulmonary irritants.  Needs to avoid vibration.  Can perform each of the following postural activities occasionally: balancing, stooping, crouching, kneeling, crawling.  Needs to avoid climbing.  Can such an individual do claimant's past work? (Tr. 72-73).

The VE replied that the above-described individual would be unable to perform Plaintiff's past relevant work, but could perform the sedentary, unskilled work of an assembler (1,600

---

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;"  *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

positions in the regional economy); sorter (1,200); and packer (1,500) (Tr. 73-74). The VE stated that if hypothetical restrictions were amended to include the need to take an unscheduled break for at least one hour a day, or, the need to miss work for more than two days a month, all work would be precluded (Tr. 74-75). The VE concluded by stating that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*"), adding that the testimony regarding the sit/stand option was based on her own professional experience (Tr. 75).

### D. The ALJ's Decision

Citing the medical records, the ALJ determined that Plaintiff experienced the severe impairments of "generalized anxiety disorder ("GAD"); major depressive disorder ("MDD"), recurrent, moderate to severe with a history of psychosis; morbid obesity; type 2 diabetes with neuropathy; hypertension; residual neuropathic pain secondary to bimalleolar left ankle fracture, status-post open reduction internal fixation ("ORIF") with hardware removal; adhesive capsulitis/acromioclavicular ("AC") joint arthrosis of the right shoulder; history of iron deficiency anemia; history of nephrolithiasis; obstructive sleep apnea ("OSA"); history of chest pain, angina versus musculoskeletal; headaches; hypercholesteremia; lumbago; and left knee patellofemoral arthrosis/chondromalacia" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr.41-42).

The ALJ found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 42-43). He found that Plaintiff retained the residual functional capacity ("RFC") for sedentary work with the following additional limitations:

[R]equires work that is unskilled with one, two, or three-step instructions;

-11-

occasionally in close proximity to coworkers and supervisors, meaning that the claimant cannot function as a member of a discrete team and contact with co-workers and supervisors is largely superficial; no direct interactive contact with the public; restricted to a 'low stress' environment defined as having occasional changes in the work setting; able to lift and/or carry five pounds frequently and ten pounds occasionally, from very little to one-third of an eight-hour workday; requires a sit/stand option while remaining at the workstation, meaning that the claimant can sit or stand at will while performing her assigned duties; able to stand and/or walk, with normal breaks, for a total of two hours in an eight-hour workday; occasionally needs a cane to ambulate; able to sit with normal breaks for a total of six hours in an eight-hour workday; able to perform pushing and pulling motions with the upper and right lower extremities within the aforementioned weight restrictions for no more than two-thirds of an eight-hour workday, but can only occasionally do so with th left lower extremity; no more than occasional overhead reaching with the right upper extremity; able to perform activities requiring bilateral manual dexterity for both gross and fine manipulation with handling and reaching for no more than two-thirds of an eight-hour workday; must avoid hazards in the workplace such as moving machinery and unprotected heights; must avoid vibrations; restricted to a 'relatively clean' work environment menaing stable temperatures, stable humidity, and good ventilation that allows the claimant to avoid concentrated exposure to dust, fumes, gases, odors, and other pulmonary irritants; and can perform each of the following postural activities occasionally: balancing, stooping, crouching, kneeling, and crawling, but . . . must avoid climbing (Tr. 44).

Citing the VE's job findings, the ALJ found that although Plaintiff was unable to perform her past relevant work, she could work as an assembler, sorter, or packer (Tr. 50-51).

The ALJ discounted the allegations of disability. He rejected Dr. Mills' December, 2012 consultative psychological "disability" finding on the basis that Plaintiff "performed well" on mental status testing (Tr. 47). The ALJ noted that Plaintiff was able to take care of her personal needs and cook, and care for her daughter (Tr. 47). The ALJ discounted Dr. Mills' finding of a GAF of 45 on the basis that Plaintiff had not received specialized mental health treatment as of the date of the consultative examination (Tr. 48). The ALJ also cited the treating records showing normal behavior and concentration (Tr. 48). As to the allegations of physical disability, the ALJ cited April, 2013 orthopedic records showing that Plaintiff did not require the use of a cane or other assistive device and Dr. Vaidya's finding

that Plaintiff was capable of a sit-down job (Tr. 45, 49, 367).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence,

whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A. Obesity

Plaintiff argues first that the ALJ undermined the effect of obesity on Plaintiff's work abilities. *Plaintiff's Brief,* 14-16, *Docket #20,* Pg ID 761.

In the instance that a claimant is found to be obese, the Commissioner must conduct an individualized assessment of the impact of the claimant's obesity on his or her functional abilities. SSR 02–1p, 2002 WL 34686281, *3 (June 21, 2002). However, when determining the impact upon an individual's ability to function, SSR 02–1p "does not mandate a particular mode of analysis, but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Commissioner of Social Sec.*, 359 Fed. Appx. 574, 577 (6th Cir. 2009).

The ALJ did just that. First, he found that the condition of morbid obesity was a severe impairment (Tr. 41). Second, he noted that Plaintiff experienced "extreme" obesity under the medical criterial established by the National Institutes of Health (Tr. 47). The ALJ observed that Plaintiff had been repeatedly diagnosed with morbid obesity and that one physician opined that it aggravated the left ankle problems and was the cause of her antalgic

gait (Tr. 47).  The ALJ reasonably found that morbid obesity "exacerbate[d] her work limitations" (Tr. 47).  Consistent with the obesity analysis, the ALJ factored the condition of morbid obesity into the RFC, restricting Plaintiff to sedentary work with a sit/stand "at will option" and work that allowed for the use of a cane (Tr. 44).

Plaintiff's claims that the ALJ's erroneous statement that she weighed 280 pounds (rather than her reported weight of 380) invalidates the entire obesity analysis.  *Plaintiff's Brief* at 14-15 (*citing* Tr. 47).  As discussed above, the ALJ discussed the condition of obesity at length, correctly noting that Plaintiff experienced "morbid" obesity.  He adopted the treating records indicating that the condition caused some degree of workplace limitation.  As such, the ALJ's misstatement is harmless error.

Moreover, while the treating and consultative opinions suggest that obesity caused workplace limitations, none of sources determined that she required greater limitations than those found in the RFC:  September, 2011 (PT records showing functional range of motion and strength, Plaintiff "ideal candidate" for "return to work" services)(Tr. 432); October, 2011 (Plaintiff's worry about her physical limitations "overshoot[s] her actual limitations" (Tr. 408); December, 2011 (Plaintiff capable of exertionally light work with a sit/stand option)(Tr. 458); May, 2012 (Plaintiff was able to perform "sit-down" work once she recovered from the surgical removal of hardware)(367).

Finally, citing *Warren v. Commissioner of Social Sec.,* 2015 WL 1245936, *19 (E.D.Mich. March 18, 2015), Plaintiff asserts that the ALJ was required to find her disabled *before* determining whether obesity was the "but for" cause of disability as required in cases where drug addiction causes work-related limitations.  *Plaintiff's Brief* at 16.  However, the claim that the condition of obesity requires the same analysis as drug abuse is wholly unsupported by case law or the Social Security Regulations.  *Compare* SSR 13-2p, 2013 WL

621536, *4–5 (February 20, 2013)(after completing the five-step analysis, ALJ then determines if drug addiction "but for" cause of disability); 20 C.F.R. § 404.1535(b) *with* SSR 02–1p (obesity to be considered at Steps Two and Three and in crafting the RFC *prior* to the finding of disability).  While an ALJ is required to perform the sequential analysis before considering whether the disability is caused by substance abuse, Plaintiff provides no support for the argument that the same mode of analysis is required where obesity contributes to the workplace limitations.

For these reasons, the ALJ's analysis of the condition of morbid obesity does not provide grounds for remand.

### B.  The Physical Limitations

Plaintiff also argues, in effect, that the ALJ's finding that she could perform a range of sedentary work is based on a misreading of the treating records.  *Plaintiff's Brief* at 16-19. She argues that the ALJ's citation to Dr. Vaidya's finding that she could perform "sit down jobs" does not support the RFC for sedentary work would require her to stand or walk for up to two hours in an eight-hour workday.  *Id.* at 17-19 (*citing* Tr. 45, 367).

Dr. Vaidya stated in May, 2012 that Plaintiff would be restricted to "a sit-down job" once she recuperated from the April, 2012 hardware removal (Tr. 367).  The ALJ adopted the finding in concluding that Plaintiff would be limited to "a reduced range of sedentary work with limited use of the left lower extremity" and would require "a primarily sit-down job" (Tr. 45).

Plaintiff's argument that "primarily sit-down job" is different from Dr. Vaidya's finding of simply "a sit-down job" is not well taken.  Dr. Vaidya's finding that Plaintiff required sit-down work (instead of her former exertionally heavy position) cannot be interpreted to state that she was incapable of the standing and walking requirements for

-16-

sedentary work. Plaintiff's contention that the ALJ mischaracterized Dr. Vaidya's May, 2012 finding is without merit.

Further, while the ALJ's is only required to support his findings with "substantial evidence," a preponderance of evidence easily supports the finding that Plaintiff was capable of a range of sedentary work within a year of the April, 2011 injury. Plaintiff reported that as of August, 2011, she could stand for up to 45 minutes at a time (Tr. 376). In October, 2011, Dr. Geffrard, opining that Plaintiff overestimated her limitations, wrote a prescription for a "work hardening program" (Tr. 482-484). In December, 2012, Dr. Friedman found that Plaintiff had an "essentially normal gait" and was capable a range of exertionally light work[5] (Tr. 458). Her claim that she was unable to walk for even two hours in an eight-hour workday is also undermined by August, 2013 records showing that Plaintiff pulled a muscle while climbing over sand dunes (Tr. 584). Plaintiff's ability to walk/climb outdoors on a recreational basis stands at odds with her claim that she is unable to meet the walking requirements for a limited range of sedentary work. While the RFC composed by the ALJ precluded all climbing (including ramps and stairs) the record evidence actually supports a lesser degree a limitation.

### C.  The Mental Impairments

In her third argument,[6] Plaintiff argues that the ALJ erred by according only limited weight to Dr. Mills' December, 2012 finding of disabling psychological limitations.

---

[5]
While one source found in December, 2011 that the work hardening program should be canceled due to upcoming hardware removal surgery, the finding appears to be based on the fact that the surgery would disrupt the work hardening program, not because Plaintiff was unable to work as of December, 2011.

[6]Plaintiff's brief incorrectly lists this as her fourth argument. *Plaintiff's Brief* at 19.

*Plaintiff's Brief* at 19-21. As discussed in Section II.B.2, *above,* Dr. Mills found in December, 2012 that Plaintiff's psychological limitations rendered her "unable to do work activities" and assigned her a GAF of 45 (Tr. 517).

As an initial matter, because Dr. Mills was a one-time examining rather than treating source, his opinion was "entitled to no special degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994) (*citing Atterberry v. Secretary of Health & Human Servs.*, 871 F.2d 567, 572 (6th Cir.1989)). Moreover, the ALJ's rejection of Dr. Mills' conclusions speaks for itself:

> The undersigned gives the GAF score, and [Dr. Mills'] conclusion that she could not work in any capacity, little weight for several reasons. First it is inconsistent with the claimant's reported daily activities and lack of specialized mental health treatment at the time. Furthermore, the claimant exhibited largely normal behavior on subsequent mental status examinations . . . below discussed. Finally, Dr. Mills only met and examined the claimant on one occasion; he was not a treating source []. Dr. Mills' conclusion that the claimant could not perform any work-related activities is also broad and conclusory. [SSR] 96-5p indicates that whether an individual is 'disabled' under the Social Security Act is an issue reserved to the Commissioner. Again, a conclusion of 'disability' is inharmonious with the claimant's lack of specialized treatment at the time and subsequent demeanor at various mental status examinations (Tr. 48).

The ALJ went on to note that February, 2013 psychological intake records contradicted Plaintiff's claim to Dr. Mills that she no longer wanted to live (Tr. 48, 620). The ALJ noted that the intake records also showed that Plaintiff was able to engage in a wide range of daily activities (Tr. 620). More generally, the ALJ's finding that Plaintiff experienced "moderate" concentrational deficiencies (Tr. 43) actually overstates treating records showing that she experienced only mild limitations in concentration (Tr. 630).

Because the rejection of Dr. Mills' conclusion is well supported and explained, Plaintiff is not entitled to a remand on this basis.

-18-

### D.  The Step Five Determination

Finally, Plaintiff argues that the VE failed to adequately support the finding that Plaintiff could perform the jobs of assembler, sorter, and packer.  *Plaintiff's Brief* at 21-24. She notes that the DOT codes provided by the VE refer to narrow subcategories of positions within the three occupations: "eye-dropper  assembler," "nut sorter," and "ampule sealer." *Id.* at 22.  Plaintiff contends that "[i]t is extremely unlikely doubtful" that the narrow positions cited by the VE amount to 4,300 jobs in Southeastern Michigan.  *Id.*

Plaintiff's final argument fails for a number of reasons.  First, I agree with Defendant's contention that Plaintiff's claim that the three sample jobs cited by the ALJ do not constitute significant numbers is mere speculation.  *Defendant's Brief,* 20, *Docket #26,* Pg Id 815.  Plaintiff's claim that "It is extremely doubtful" that 4,300 of the specialized jobs within the categories of assembler, sorter, and packer exist in Southeastern Michigan is unsupported by any facts.

Aside from that, the VE stated that the DOT codes she cited were "samples" of each position within each of the three broad occupational categories (Tr. 74).  Plaintiff's claim that the VE failed "to even make clear whether those [DOT codes] refer[ed] to the entire class of jobs to which she testified, or merely to the 'sample' jobs," *Plaintiff's Brief* at 23, is contradicted by the hearing transcript which shows that the VE found that the hypothetical limitations allowed for the jobs of assembler, directly followed by a "sample" (assembler DOT code of one position within the broader occupation) then "sorter," followed by a sample code for sorter, and then packer (same)(Tr. 74).

Further, Plaintiff provides no support for his claim that the VE's testimony is invalidated by providing only sample codes.  For example, the DOT contains hundreds of

-19-

subcategories within the generalized occupation of assembler.[7]  My own non-exhaustive review of the DOT assembler positions reveals two other sedentary, unskilled "assembler" positions which would be responsive to the hypothetical limitations set forth by the ALJ: DOT code 713.687-018, final assembler (optical goods) and 734.687-018 assembler (button & notion).  Plaintiff's claim that the VE was required to cite every unskilled, sedentary assembler position found in the DOT to meet the Commissioner's burden at Step Five is unsupported by either case law or common sense.

In closing, the transcript generously supports the finding that Plaintiff was not disabled for a 12-month period or longer.  The ALJ's well-reasoned decision contains a thorough analysis of the medical and other evidence, including the wide disparity between Plaintiff testimony that she was unable to perform any household or childcare activities and her reports to the treating sources.  Because the determination was well within the "zone of choice" accorded to the fact-finder at the administrative hearing level,  it should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

## <u>CONCLUSION</u>

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #26] be GRANTED and  that Plaintiff's Motion for Summary Judgment [Docket #20] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v.*

---

[7]http://www.occupationalinfo.org (last visited, February 9, 2017).

*Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
United States Magistrate Judge

Dated: February 13, 2017

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 13, 2017, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager